THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DALE ANDERSON, Defendant-Appellant.

Fifth District   No. 5—90—0361

Opinion filed December 2, 1992.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Dale Anderson was convicted in the circuit court of St. Clair County of the murders of Jolaine and Kenneth Lanman. The State's theory was that Anderson committed these murders with the intent of framing Charlotte Kroupa, Bob DeLaria, and Maurice Vale, his former supervisors at the Illinois Department of Public Aid (IDPA), against whom he had a grudge.

John Lanman testified that around 5 p.m. on September 27, 1989, he returned home to find his wife and son dead. Their faces were covered with blood and a pair of scissors was protruding from Jolaine's neck. It was subsequently determined that both died of blunt trauma to the head and stab wounds to the neck. Jolaine Lanman was last seen alive around 11:50 that morning by a neighbor, Brenda Nixon. Allen Schordeide testified that he spoke to Jolaine by telephone around 3:34 p.m. that day and that she seemed very "upbeat."

Martha Mayberry testified that about 2:15 that afternoon she observed a blue car park next to her neighbor's house. The driver changed hats and drove slowly toward the home of Janice Condor. Condor is Mayberry's daughter. Mayberry became suspicious and called Condor. Condor testified that she observed the car park near her house, and that after about five minutes, a man got out wearing a baseball cap and carrying a black bag with a thin leather strap, and walked up the street. Condor identified the defendant as the man she saw. Condor and Mayberry walked over to the car and copied down the license plate number. They also noticed the initials "BBB" on the back left side. Condor saw the car leave about 4:45 p.m. Mayberry indicated that she remembered the car because it had a loud muffler and engine.

Cheryl Scott, another neighbor, testified that on September 20, 1989, a man identifying himself as Dave Johnson came to her door and asked to see her house, which was for sale by the owner. She be-

came uncomfortable when he asked to see the crawl space in the master bedroom for the third time. After about an hour, a neighbor came in the back door, and the man quickly exited through the front door. Scott identified the defendant as the man who had been in her house.

Another neighbor, Jill Hendricks, testified that on September 27, 1989, a man knocked on her door and wanted to see her house, which was also for sale. The man was wearing a baseball cap and had a portfolio-size bag slung over his shoulder. Because her house was listed through a real estate agent, Hendricks gave the man the agent's card and he left. Hendricks also identified the defendant as the man who had come to her door.

The Lanman house was also for sale by the owner.

Shortly after police were notified of the Lanman murders, St. Clair County deputy sheriff James Lay was informed that a car with a license plate number later determined to be registered to defendant was seen in the area. Police subsequently set up a surveillance team outside the defendant's home. They attempted to contact defendant, but he did not answer the door or his phone. Cardboard had been placed over all the windows, and no one left the house from the evening of September 27 to the morning of September 29. Defendant's wife testified that during this time defendant listened to his police scanner.

On the morning of September 29, 1989, the police obtained a warrant to search defendant's home and to obtain samples of defendant's handwriting. The police seized numerous articles from defendant's home, including four briefcases, a large suitcase, several small suitcases, several boxes of documents, clothing, newspaper articles and weapons.

Forensic experts testified that it could not be positively stated that blood found at the Lanman home had come from defendant, that defendant's fingerprints were not found on anything at the Lanman home, and that it could not be positively stated that any hairs or fibers taken from the Lanman home had come from defendant or that any hairs or fibers taken from defendant's house belonged to the victims. A cloth glove print was determined to match a glove found in defendant's home.

A note, found under the bed next to Jolaine Lanman's body, read as follows: "A wanan and 2 men hit me they called each other croupa Bob Dlany and Varl. The bragged about killing audrey Cardenas There Il LPN CRX 15 and KDH 221." A handwriting expert testified that it was highly probable that the note had been written by Jolaine.

The license number of Vale's car was KDH 221. The license number of Kroupa's car was CPK 15.

A great deal of evidence was introduced, over defendant's objection, concerning defendant's problems with his supervisors at IDPA—Bob DeLaria, Charlotte Kroupa, and Maurice Vale.

Mrs. Jean Earl testified that in 1986, when defendant was working at the East St. Louis IDPA office, she complained to Vale that defendant was threatening her. During a meeting between Vale, Earl and defendant, defendant stated that his family did not like what was being done to him and that he had friends on the police department. Vale was promoted and transferred to the Belleville IDPA office in March of 1987, and defendant was promoted and transferred there five months later. Dorothy Perkins was defendant's supervisor, Kroupa was Perkins' supervisor, and Vale was Kroupa's supervisor.

As a result of an investigation into numerous complaints from IDPA applicants that their applications were being withdrawn without their consent, defendant was suspended for three weeks. He was later involuntarily demoted. About this time DeLaria became his supervisor. It was subsequently noted that defendant was mismanaging his case files and falsifying records. When confronted with this, defendant became belligerent toward DeLaria. DeLaria had several other conferences with defendant regarding his work performance over the next several months, and Delaria disciplined defendant in May of 1987 by sending him home.

Defendant's supervisors decided on May 23, 1987, to have him switch caseloads with a co-worker, Mary Reibling, in order to better monitor his work performance. That afternoon, Reibling complained to her supervisors that defendant was refusing to relinquish control over all of his papers and was hiding some in his briefcase. Vale, DeLaria, and Kroupa met with defendant and asked him to open his briefcase, but defendant indicated that he had dropped it and jammed the lock.

Approximately one week later, Vale, DeLaria, and Kroupa were arrested by the Belleville police based on a complaint filed by defendant accusing them of assaulting him and taking money and papers from his briefcase. The charges were eventually dismissed. Testimony was introduced at trial that defendant reported to police that Vale, DeLaria, and Kroupa had threatened to kill him if he testified.

Defendant was discharged from the IDPA on August 8, 1988. Defendant appealed his discharge to the Illinois Civil Service Commission on August 29, 1988. After several continuances, defendant was informed on September 7, 1989, that no further continuances would

be granted. Several days earlier he had received notice that his application for employment at Belleville Area College had been rejected.

Several of defendant's co-workers testified as to the problems they had with defendant's work, including an unusual number of applications to withdraw aid and failure to provide accurate information in documents. They also testified that defendant typically wore a baseball cap and carried a briefcase and a black bag with a strap.

Margaret Wagner, a special agent for the FBI, testified that defendant contacted her in June of 1988 and told her that he had been summoned to his supervisor's office and had seen his supervisor close a drawer full of money. Defendant claimed that his supervisor threatened to kill him if he said anything, pushed him around the office, and took his briefcase. Wagner decided that there was insufficient evidence to pursue the matter further.

Several people testified regarding defendant's interest in the highly publicized murder of Audrey Cardenas, an intern with the Belleville News-Democrat, a local newspaper, and of defendant's attempts to connect his supervisors with the murder. Bonds Robinson, an acquaintance of defendant, testified that defendant telephoned him and stated that he had been interviewed by Cardenas and that he advised her not to publish the article because he feared his supervisors would harm her. He also implied that if he revealed all that he knew, his supervisors would be indicted for her murder. Defendant wrote a letter, purportedly written by Kroupa, stating that Kroupa had witnessed Vale and DeLaria murder Cardenas and that they threatened to kill her if she told anyone. Kroupa denied writing the letter. Veronica Denton, a neighbor and friend of defendant's daughter, testified that defendant had her write a note claiming that she had seen Cardenas at defendant's home, that Cardenas had indicated she had interviewed Vale, DeLaria, and Kroupa, and that they threatened to kill her if the paper published any further stories about them. At trial, Denton denied ever seeing Cardenas at defendant's home and stated that defendant wrote out the note and she simply copied it. Bill Glasscock and Jerry Durring also testified that defendant implied that his supervisors were responsible for the Cardenas murder.

Defendant testified that he was aware that some of his supervisors were complaining about his work. He stated that he had been demoted when he was injured at work and forced to take time off, thus preventing him from completing a number of assignments. Defendant also testified that he had been asked to switch caseloads with Reibling because some of the other caseworkers were not doing their jobs correctly. When he met later with Vale, DeLaria, and Kroupa, he did not

want them to go through his briefcase because it contained complaints about other workers. Defendant claimed that his briefcase was taken from him and the documents read. According to defendant, after filing assault charges against his supervisors, they began threatening to kill him.

Defendant also claimed to have met with Audrey Cardenas twice in June of 1988, to discuss her investigation of the IDPA. He also claimed to have met Rodney Woidtke in May or June of 1988. Woidtke had been convicted of Cardenas' murder in August of 1989. He testified that after Cardenas was murdered, Veronica Denton told him she wanted to write a statement indicating that she had seen Cardenas at defendant's home.

Defendant also testified that on September 17, 1989, he went shopping for tires and returned home about 3 p.m. He cleaned the garage, put oil and antifreeze in his car, and drove it around the neighborhood, returning home again around 5 p.m. Defendant denied ever being in Lanman's neighborhood and claimed that an old set of license plates had been stolen several weeks prior to the murders. He maintained that no one left the house between September 27 and 29 because the family was sick with colds. He denied that anyone had tried to contact him until police "broke into" his home on September 29, 1989, to execute a search warrant. Defendant testified that the holsters, handcuffs, black jacks, and guns police found in his briefcases had been acquired when he worked for the sheriff's department and that he received many of the knives as Christmas presents.

Defendant was found guilty of both counts of murder and sentenced to a term of natural life.

Defendant first argues that he was denied a fair trial when the State introduced previously excluded evidence regarding whether defendant had taken a polygraph examination. During the course of defendant's direct examination, the following exchange took place:

"Q. [DEFENSE COUNSEL]: You have been asked that question [whether defendant killed Jolaine and Kenneth Lanman] by the police on several occasions, right?

A. [Defendant]: Yes, sir.

Q. And you have, just so the record is clear, you didn't kill those two persons, is that right?

A. No, sir, I did not. Like, for example, on September 29, Linda [Mr. Anderson's wife] and I talked to the police about it. We cooperated and answered their questions. We didn't try to—you know, we tried to cooperate with them as much as we could. We have tried to do everything we could to prove we

were telling the truth and we are not involved in this case. In fact, we have got the police polygraph tests to prove that Linda and I are telling the truth.

Q. [PROSECUTOR]: I am going to object, Your Honor.

THE COURT: Sustained.

[PROSECUTOR]: And ask the jury to be instructed to disregard that remark.

THE COURT: The jury is instructed to disregard the witness' last comment. That is totally improper."

On cross-examination, the following exchange took place:

"Q. And you were never—you never, never took a polygraph in this case, did you?

A. [Defense Counsel] told me not to bring that up.

Q. Well, you brought it up. You never took one, did you?

A. He has instructed me I can't talk about it.

Q. Well, you brought it up first. You never took one, did you? Did you?

A. I just said I have been instructed not to talk about it.

[PROSECUTOR]: Your Honor, I would ask the Court to tell the witness to answer the question.

[DEFENSE COUNSEL]: Judge, I want to object. The Court told the jury to disregard that testimony.

THE COURT: Let me explain something to the jury. In Illinois, if a person takes a polygraph test and passes the test, that is inadmissible in a court. If a person is asked to take a polygraph test and fails the test, that is likewise not admissible in court. If a person is asked to submit to a polygraph test and refuses to take a polygraph test, that is likewise inadmissible in court.

I will allow the State to ask this question but once again, for a very limited purpose and that is as it relates to this witness's credibility on the witness stand during the course of this trial. The witness is instructed to answer the question.

A. I was referring to that polygraph report, I was talking about the questions that my wife answered.

Q. I am not talking about your wife. I am talking about you. You said, 'We took a test.' You never took one, did you?

A. I have got a copy.

Q. Did you take the test?

A. I got a copy of the report here.

[PROSECUTOR]: I ask the Court to identify that piece of paper. Again, Your Honor, I would ask him to identify that piece of paper.

&ast; &ast; &ast;

Q. You have handed the Judge People's Exhibit 386 dated September 29, 1989. That deals with your wife, isn't that correct?

A. That is correct.

Q. My question to you, did you ever take a polygraph?

A. No, I didn't.

Q. So when you said that three or four days ago, last week, that is not true, was it?

A. What I said was that polygraph test shows that—

Q. I am not asking you what, I am asking you when you said that you took one, you didn't, did you?

A. I didn't say I took one. I said—

Q. You said you and your wife took one, didn't you?

A. I said the polygraph test shows—

[PROSECUTOR]: I object Your Honor, again to what the results of the polygraph test on someone else has any relevancy on this case.

THE COURT: Mr. Anderson, you are already aware of the fact that the result itself, if any, are [*sic*] inadmissible. I am instructing you to answer the question that [the prosecutor] asked and not some other question.

A. What was the question, &ast;&ast;&ast;?

Q. You never took one, did you?

A. No. Of course you might ask —

[PROSECUTOR]: That is all I have.

A. I was never asked to take one."

The State concedes that the result of a polygraph test or the fact that one was given is inadmissible but argues that evidence of whether one was offered is admissible in the present case as it bears on defendant's credibility.

Our supreme court has explained that the reasons for the rule excluding polygraph evidence are that such tests have not reached a level of sophistication that makes them generally reliable and that there is a danger that the results of such tests will have a disproportionate level of influence on the jury. (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.) This rule is not without exceptions, however. (See *People v. Jackson* (1990), 198 Ill. App. 3d 831, 845, 556 N.E.2d 619, citing *People v. Triplett* (1967), 37 Ill. 2d 234, 226 N.E.2d

30 (voluntariness of a confession); see also *People v. Melock* (1992), 149 Ill. 2d 423, 599 N.E.2d 941 (credibility and reliability of a confession).) Defendant's gratuitous statement implying that he had passed a polygraph exam severely prejudiced the State. Even though the State objected and the objection was sustained, the damage was done. Generally, the sustaining of an objection and instructions to the jury will cure the error resulting from evidence improperly placed before the jury. There are some cases where such action is not sufficient to ameliorate the prejudicial effects of improper evidence. (*People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) In such situations, the party prejudiced will be permitted to introduce otherwise inadmissible evidence to cure the harm done. (*People v. Marino* (1980), 80 Ill. App. 3d 657, 400 N.E.2d 491.) We believe the present case presents just such a situation.

Defendant maintains that he did not open the door for the admission of this line of questioning because it is reversible error to bring evidence before the jury in violation of the court's prior ruling and because defendant never claimed to have taken a polygraph exam in connection with the present case.

■ Addressing defendant's first contention, a review of the record demonstrates that although the trial court sustained the prosecutor's objection to defendant's gratuitous statement implying that the test results proved that he was telling the truth, the trial court specifically permitted the prosecutor to question defendant regarding the truth of his previous assertion that he had taken a polygraph exam. The trial court informed the jury that this evidence was being admitted solely as it related to defendant's credibility.

■ We also find defendant's second contention unpersuasive. Defendant maintains that he never claimed that he took a polygraph examination. It is difficult to imagine, however, any other plausible interpretation of his statement.

The reason that evidence regarding polygraph exams is generally forbidden is that it is highly prejudicial. In situations such as the present, where the defendant himself unmistakenly implies to the jury that he has passed a polygraph exam when in fact he has not taken one at all, it is the State that is prejudiced. To allow a defendant to create such a false impression in the minds of the jury and then to allow him to use the rule barring polygraph exam evidence as a shield to prevent the State challenging him would be a blatant perversion of the rule and a gross miscarriage of justice.

Defendant next contends that he was denied a fair trial by the introduction of numerous photographs, guns, and other weapons not re-

lated to the offense charged. Defendant argues that much of this evidence was irrelevant, cumulative, and highly prejudicial. Specifically, defendant argues that the admission of numerous photographs of the victims at the scene, as well as autopsy photographs, was erroneous because neither the cause of death nor the nature and extent of the injuries were at issue. Defendant concedes that it is within the trial court's discretion to introduce photographs, even those of a gruesome nature, if they are relevant to establishing material fact in issue. He maintains, however, that because the nature and extent of the injuries were not an issue, and given the extensive medical testimony of the pathologist who performed the autopsies, the photographs had no probative value and served only to prejudice him.

The decision whether to admit photographs is within the sound discretion of the trial court, and " 'where photographs are relevant to establish any fact in issue *** they are admissible in spite of the fact that they may be of a gruesome nature.' " (*People v. Fierer* (1988), 124 Ill. 2d 176, 193, 529 N.E.2d 972, 979, quoting *People v. Speck* (1968), 41 Ill. 2d 177, 202, 242 N.E.2d 208, 222.) Such photographs may be admitted

> "to prove the nature and extent of the injuries and the force used to inflict them; the position, condition, and location of the body; the manner and cause of death; to corroborate a defendant's confession, and to aid in understanding the testimony of a pathologist or other witness. [Citations.] And while such photographs may be somewhat cumulative of the testimony of a witness, such as a police officer, who described the condition and location of the body, they may also aid jurors in understanding this testimony." (*People v. Henderson* (1990), 142 Ill. 2d 258, 320, 568 N.E.2d 1234, 1263-64.)

The crime scene photographs corroborated the testimony of John Lanman, who first discovered the bodies when he arrived home, as well as the testimony of Deputies Mathis and Jones, and crime scene technician Bush, all of whom testified regarding their examination of the crime scene. The crime scene photographs also served to aid the jury in understanding the manner in which certain wounds were inflicted and the willfulness of the act. (*Speck*, 41 Ill. 2d at 203, 242 N.E.2d at 222; *People v. Montague* (1989), 182 Ill. App. 3d 737, 538 N.E.2d 669.) We conclude that the probative value of the crime scene photographs outweighed their prejudicial effect and were properly admitted. Likewise, the autopsy photographs were properly admitted because they aided the jurors' understanding of the testimony of the pathologist, Dr. Nandori, with regard to the type of wounds, the type of instru-

ment used to cause them, the extent of the injuries, and the amount of force applied. *Henderson*, 142 Ill. 2d at 320, 568 N.E.2d at 1263.

■ Defendant also maintains that he was denied a fair trial by the introduction of numerous guns, knives, blackjacks, and other items found in defendant's home, which were irrelevant because there was no evidence to connect them to the offenses charged. "Evidence is relevant if it has 'any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence.' " (*People v. Mitchell* (1992), 152 Ill. 2d 274, 332, quoting *People v. Free* (1983), 94 Ill. 2d 378, 425, 447 N.E.2d 218, 236.)

> " '[A] weapon may be admitted in evidence where there is proof to connect it with the defendant and the crime. However, it is not necessary to establish that the particular weapon was the one which was actually used. Where the proper connection is established and it is shown that defendant possessed a weapon which could have been used in the commission of the crime, it may be admitted in evidence.' " (*People v. McCasle* (1966), 35 Ill. 2d 552, 559, 221 N.E.2d 227, 231, quoting *People v. Ashley* (1960), 18 Ill. 2d 272, 280, 164 N.E.2d 70, 74.)

While the pathologist testified that she could not state with any reasonable degree of medical certainty that any of the items shown to her at trial caused any of the injuries to either of the victims, she did testify that some of the stab wounds could have come from the knives and some by the needles and syringes, and that the blunt trauma could have been caused by a blackjack, a metal bar, or a revolver. We cannot conclude that the trial court abused its discretion in admitting the items in question into evidence.

Defendant next argues that he was not proved guilty beyond a reasonable doubt because there was no direct evidence linking him to the murders and because the inferences drawn by the State from the circumstantial evidence were not reasonable. When reviewing the sufficiency of the evidence, the relevant question on appeal is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) This is true even where the evidence is entirely circumstantial. *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.

In the present case, the State's theory was that defendant murdered the victims and attempted to frame his former supervisors at IDPA for the crime, in retaliation for his discharge from his job. Defendant contends that the evidence fails to support this theory.

A number of witnesses testified as to defendant's problems at work. Vale testified that sometime in 1986, defendant's supervisor, Mrs. Earl, and Vale met with defendant to discuss problems with his work. Defendant told them that his family did not like what they were doing to him and that he had a lot of friends on the police department. Shortly after being transferred to the Belleville office in 1987, defendant was suspended from work for three weeks as a result of an investigation initiated by client complaints. Several months later defendant's new supervisor, DeLaria, began complaining about defendant's work and defendant's belligerence toward himself, Vale and others. Vale also testified that defendant had hidden case materials in his briefcase. When Vale, DeLaria, and Kroupa met with defendant and asked him to open the briefcase, defendant indicated that he had dropped it and jammed the lock. Defendant subsequently filed a complaint with the Belleville police department alleging that Vale, DeLaria, and Kroupa had assaulted him and taken his briefcase and some money. All three were arrested, but the charges were subsequently dismissed.

After the murder of Audrey Cardenas, defendant began telling people that Cardenas had interviewed him about his supervisors and had told him that they had threatened to kill her. Defendant also told people that his supervisors were responsible for her murder. Veronica Denton testified defendant persuaded her to write a letter to the newspaper stating that Cardenas had been to defendant's home and that defendant's supervisors threatened to murder her. Denton stated that the statements she made in the letter were not true and that she merely copied what defendant had written for her. Defendant claimed that Cardenas had been to his home twice while his wife and children were there, but his wife and children denied this. Defendant's wife testified that defendant was obsessed with his supervisors and wanted to get something on them before his discharge appeal hearing in order to save his job.

Cheryl Scott testified that around 3:30 p.m. on September 20, 1989, defendant appeared at her door asking to look at her house, which was for sale. He was wearing a baseball cap and carrying a "portfolio-type satchel." Defendant left quickly when a neighbor came in. Defendant had parked his four-door blue Oldsmobile nearby.

Jill Hendricks testified that at approximately 2:40 p.m. on September 27, 1989, the day of the murders, defendant appeared at her door and asked to see her house, which was also for sale. Defendant was wearing a baseball cap and carrying a bulging bag.

Martha Mayberry and Janice Condor both testified that around the time of the Lanmans' murders they observed in the neighborhood a car the description of which matched defendant's car, and that the car had the same license plate number as defendant's car. Fifteen minutes later, John Lanman came home and found that his wife and son had been murdered. A subsequent check of the license number and description of the car yielded defendant's name and address.

Defendant's wife testified that from the time of the murders until his arrest, defendant kept all the windows covered with cardboard, did not allow his children to go to school or his wife to go to work, and listened to his police scanner with an earplug. Defendant would not answer the door when police came to talk to him, and when they entered the Anderson home on September 29, 1989, pursuant to a warrant, defendant first refused to come out of the bedroom and then crouched behind his wife as if she were a shield. Police found four briefcases, a large suitcase, and several smaller suitcases in defendant's bedroom. In several of the briefcases were knives, blackjacks, a metal bar, and guns.

■■ When the foregoing evidence is viewed in a light most favorable to the prosecution, we cannot say that no rational trier of fact could have found the defendant guilty.

■■ Defendant next contends that he was denied a fair trial when the prosecutor, during his closing argument, repeatedly referred to facts not in evidence and drew improper inferences from the facts. We note, however, that defendant raised no objections during the prosecutor's closing argument, thereby waiving any allegations of error for purposes of appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The defendant does not argue that the prosecutor's allegedly improper comments constitute plain error, and therefore we will not consider this argument further.

Finally, defendant argues that the trial court erred in failing to appoint new counsel to represent him in post-trial matters after he alleged that his trial counsel had provided ineffective representation. In a *pro se* post-trial motion, defendant alleged that trial counsel did not call a medical doctor to testify that he was so disabled that he could not have committed the murders charged; did not subpoena 84 other witnesses; did not introduce his IDPA evaluations, his personnel file from the St. Clair County sheriff's department, or various letters of recommendation on his behalf; and did not bring to the attention of the jury various facts that would have cast doubt upon his guilt.

When a defendant alleges ineffective assistance of trial counsel in a *pro se* post-trial motion,

" 'the trial court should examine the factual matters underlying the defendant's claim, and, if the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed. Only if the allegations show possible neglect of the case for which counsel could undertake an independent evaluation of defendant's complaint and present the matter to the court should new counsel be appointed.' " (*People v. Davis* (1991), 208 Ill. App. 3d 33, 42-43, 566 N.E.2d 932, 938, quoting *People v. Washington* (1989), 184 Ill. App. 3d 703, 711, 540 N.E.2d 1014, 1019.)

Defendant maintains that under the test set forth in *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466, the trial court should have appointed different counsel to represent him at the hearing on his post-trial motion. Following *People v. Johnson* (1981), 98 Ill. App. 3d 228, 424 N.E.2d 610, the court in *Jackson* held that the trial court should examine the factual matters underlying the defendant's claim, and that if such factual matters demonstrate possible neglect of the defendant's case, new counsel should be appointed to undertake an independent evaluation of defendant's claim. If the claim goes to matters of trial strategy or tactics, however, defendant's request for new counsel should be denied. (*Jackson*, 131 Ill. App. 3d at 139, 474 N.E.2d at 474.) This court has adopted the test set forth in *Johnson* and *Jackson*. *People v. Generally* (1988), 170 Ill. App. 3d 668, 525 N.E.2d 106; *People v. Jackson* (1987), 158 Ill. App. 3d 394, 511 N.E.2d 923.

■ Reviewing defendant's claims of ineffective assistance of counsel in light of this standard, we conclude that the trial court correctly refused to appoint new counsel. Regarding the failure to call a medical doctor to testify as to defendant's physical condition, the record discloses trial counsel had spoken to defendant's treating psychiatrist before trial and was in all likelihood aware of the medical tests to which defendant had submitted and which disclosed that he had no such disabling injuries. Defense counsel's decision not to call a medical doctor was a matter of trial strategy, not neglect. Regarding the 84 other witnesses, defendant had raised this issue at the close of the State's case, but when the trial court attempted to ascertain what testimony would be elicited from these individuals and how such testimony would be relevant, defendant became vague and evasive. Given defendant's unwillingness or inability to explain the relevance of the proposed testimony, the trial court did not err when it refused to appoint new counsel.

Defense counsel did introduce evidence of defendant's favorable IDPA work evaluations through his cross-examination of Mrs. Earl. Defendant maintained that his personnel file from the sheriff's office would have revealed that while there he had some problems with Dave Nester, who was one of the officers who executed the search warrant on his home. Defendant does not indicate what relevance this fact has or how it would have helped his case, and we again conclude that the trial court correctly refused to appoint new counsel for defendant.

Defendant also argues that trial counsel failed to introduce evidence that would have cast doubt upon his guilt. Most of this purported evidence is purely speculative. Defendant claims that one of the license numbers found in the note found at the murder scene belonged to a man in Springfield and that Cheryl Scott had testified that the man who came to her house claimed to be from Springfield. This allegation is meritless because Scott positively identified defendant as the man who came to her house. Defendant's claim that defense counsel should have introduced evidence that there was a large insurance policy on Jolaine, giving John Lanman a motive to murder her, is likewise meritless as the evidence shows that John Lanman was otherwise occupied when his wife and son were murdered.

Defendant also claimed that defense counsel should have introduced evidence that Jolaine's former husband had used illegal drugs and had been physically abusive toward her, thus giving him a motive to murder her. We fail to follow the logic of this claim, but as there is no evidence that her former husband had any contact with her, we find this claim to be meritless also. Defendant alleged that the assistant State's Attorney who prosecuted him was the same prosecutor that had the assault and battery charges against DeLaria, Kroupa, and Vale reduced to disorderly conduct in June 1988; that his attorney refused to reveal the results of lab tests performed on solid waste and urine found at the victims' home and the analysis of a fingerprint at the Scott home; and that his attorney did not arrange for the jury to see and hear his car. The trial court had previously declined to let the jury see and hear defendant's car, and this other purported evidence would do no more than engender speculation as to other possible assailants. Defendant's claims are patently groundless, and the trial court did not err in refusing to appoint new counsel based thereon.

Defendant complains that trial counsel was ineffective because he did not ensure that all witnesses were excluded from the courtroom, did not share police reports with defendant, did not request a fitness or sanity hearing prior to trial, and did not object to the prosecutor's

comment, made during closing, that he was "so angry with [defendant] that he could slap him." The record discloses that the trial court had previously stated that there was no doubt as to defendant's fitness to stand trial, and defendant never specified to counsel what police reports he wanted to see. Defendant fails to indicate how the alleged failure to exclude witnesses constituted neglect. With regard to the prosecutor's comment about slapping the defendant, the record shows that the prosecutor never said that *he* wanted to slap defendant. While referring to defendant's attempts to avoid accountability for the murders, the prosecutor stated: "And you just want to slap him. You just want to say stop it." The prosecutor's comment was nothing more than an attempt to convey to the jury the idea that they should reject defendant's bizarre theories that others could be responsible for the murders and hold him accountable.

In summary, we find that no error occurred when the trial court allowed the State to cross-examine defendant regarding his previous testimony wherein he implied that he had taken and passed a polygraph exam. Defendant had never taken such an exam, and prohibiting the State from challenging his testimony would have severely prejudiced the State. Any potential prejudice to defendant was removed when the trial court specifically informed the jury to consider such testimony to be considered only as it related to defendant's credibility.

The admission of the photographs and weapons was not erroneous. Such evidence was relevant, and its probative effect outweighed any potential prejudice. Though entirely circumstantial, the evidence was such that a rational trier of fact could find the defendant guilty beyond a reasonable doubt. Finally, defendant waived the argument that he was denied a fair trial by the prosecutor's closing argument, and the trial court did not err in refusing to appoint new counsel for defendant's post-trial hearing.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

HARRISON and H. LEWIS, JJ., concur.