THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. THERESA LANE, Defendant-Appellant.

Fifth District    No. 5—98—0164

Opinion filed February 16, 2001.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Theresa Lane (defendant) was convicted of first-degree murder on December 19, 1997. The conviction stemmed from the death of Jerry Lane, defendant's husband, on December 20, 1989, in the basement of his and defendant's abode. On July 22, 1991, defendant was charged by way of information with first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now see 720 ILCS 5/9—1 (West 1996))). The first trial began on September 25, 1996, and ended in a hung jury. A second trial occurred from June 12, 1997, to June 19, 1997, and also ended in a hung jury. The third trial, the subject of this appeal, took place from December 15, 1997, until December 19, 1997. This trial ended with a jury verdict of guilty. On March 9, 1998, the trial judge entered judgment and sentenced defendant to 20 years' imprisonment. Defendant filed a notice of appeal on the same date. Defendant raises two issues on appeal: (1) whether defendant was proven guilty beyond a reasonable doubt where defendant denied her guilt and only circumstantial

evidence was used against her and (2) whether Public Act 89—689 (Pub. Act 89—689, eff. December 31, 1996), which modified the requirements governing automatic fitness hearings based upon psychotropic medication, violates the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)).

## I. FACTS

Before the trial, on July 11, 1996, defendant admitted to taking Xanax, a psychotropic drug, which defendant continued to take throughout all three trials. After defendant's admission to taking Xanax, no fitness hearing was held due to changes in the law regarding fitness hearings under Public Act 89—689 (Pub. Act 89—689, eff. December 31, 1996). The following evidence was presented at the third trial.

Defendant and the decedent lived at 9402 Richfield Road in Belleville. The decedent worked at Hunter-Krey Packing in St. Louis, and defendant owned a dog-grooming business in Cahokia. On December 20, 1989, the decedent left work at the usual time of 2:30 p.m., and he arrived home between 3 p.m. and 3:15 p.m. It was established that the decedent routinely called defendant at her dog-grooming shop when he arrived home. On the date in question, the decedent did not call defendant. Defendant called Tom Gabriel, a neighbor, at 5 p.m. to inquire as to whether the decedent's truck was at their house; he told her it was not. She immediately called the neighbor directly across the street, Ron Rahar, who stated that the decedent's truck left their home at around 3:30 p.m. At the time, Rahar assumed it was the decedent, but later he conceded that he did not see the face of the driver. Between 6 p.m. and 6:15 p.m., defendant called Hunter-Krey Packing to inquire as to what time the decedent left work, and she was told that he clocked out at 2:30 p.m.

It was established that at 2:30 p.m. on the date in question, defendant went home to get her three dogs and one cat to take to her dog-grooming shop to wash because they had fleas. Upon returning to her shop, defendant and her assistant, Katherine Poole, washed the dogs and thereafter ate pizza. At 7 p.m., Poole suggested that the two of them return to defendant's home to get her Christmas presents so they could wrap them. Defendant and Poole went to the house, and defendant noticed that the front curtains were open, which was unusual because they were normally closed. Defendant also noticed that the decedent's truck was not there. Upon approaching the house, defendant and Poole noticed fire in the house. Poole went and got a neighbor, Gabriel, who began to shovel snow on the flames. The neighbor across the street, Rahar, called the fire department and told

them that the house was on fire but that no one was alive in the house. The firefighters found the decedent, with four gunshot wounds, in the basement of the house next to an open refrigerator. No blood analysis was performed, because the technician failed to put anticoagulant in the sample. Also, no DNA was taken.

Clyde Goin, the arson investigator, testified as to the nature of the fire. He stated that there were several fires set in the house. The fires smoldered because the house was built in such a way that there was insufficient oxygen reaching the fires to create a blaze. He opined that the fires were set between 7:15 p.m. and 7:45 p.m., and there was no evidence of a time-delay device being used. He testified that the kitchen and hall fires could have been started hours earlier.

Defendant informed the police that a number of guns were missing from the home: a .38-caliber-pistol-and-.357-magnum collector's set, a small shotgun known as a "snake charmer," and two small handguns—one hidden in the china cabinet and the other on a beam in the basement. Later, defendant informed police that cash from a kitchen drawer and from the decedent's toolbox was missing. Jewelry in a cedar box on defendant's dresser and 12 pairs of men's jeans were also missing.

Defendant was suspected from the beginning of the investigation. Defendant and the decedent had recently been behind on mortgage payments on their house and the house they rented to Rahar across the street. Defendant sold stock worth a net of $6,562 and used $3,130 in November 1989 to pay the late mortgage payments and to pay the mortgage for November and December. Defendant had the habit of picking up their mail directly from the mail carrier in the neighborhood. She stated that she did so because the decedent got angry when bills were not paid on time, but he left the bill paying to defendant. The decedent had his pay cut recently, adding to their financial problems. The decedent was a heavy drinker and had been hospitalized for alcoholism a few weeks before his death. At that time, defendant told the decedent to straighten himself out or she would leave him, to which the decedent replied that he did not care. The couple had mortgage insurance that would pay off upon the death of the decedent. The decedent had a life insurance policy through Hunter-Krey Packing, which paid $6,000. The decedent had additional life insurance through Western Southern Life Insurance Company, issued in 1985. Defendant received $30,875.70 on the life insurance policy and $20,000 for accidental-death benefits. Also, defendant had recently obtained a 90-day life insurance policy from J.C. Penney for defendant, the decedent, and their son as part of a promotion for new charge-card holders in October 1989. It paid $20,819 on the death of the decedent.

Defendant received a $27,000 interest in stock that the decedent would receive from the death of his mother, which occurred in February 1991. Despite the suspicions of the police, defendant cooperated with the authorities and informed them of her impending move to Waynesville, Missouri, in November 1990, including her new address and phone number.

In October 1990 the police discovered the decedent's .38-caliber pistol when responding to a domestic disturbance in St. Louis involving Donald Isringhaus. Isringhaus informed the police that he obtained the weapon from Jose Solis and that it was part of a collector's set. The police then discovered at the home of Solis the .357-magnum complement from the set.

Trial evidence established that Rahar, the neighbor across the street, misled police about his schooling and job experience. It became evident that Rahar lived off of the disability his girlfriend and her daughter received as dependent adults. Rahar and the decedent frequently smoked and drank alcohol together, many times in the basement of the decedent's home. Rahar smoked generic cigarettes with "Q" on the butt, some of which were found in a tin can used as an ashtray in the basement. On December 20, 1989, Rahar had been Christmas shopping and returned home at around 3:30 p.m. He observed the decedent's truck leaving the neighborhood at a high rate of speed. Initially, he identified the decedent as the driver, but he later conceded that he never saw the face of the driver and could have been mistaken. The truck did not return to the decedent's home, to the knowledge of Rahar, and he stated that he was watching the street because a van was coming to pick up his girlfriend's daughter. It was established that Rahar could see the decedent's home from his bay window in the front of his house across the street. Rahar was driving a rental car at the time, and the police requested to search the vehicle, which Rahar refused. A month later, the rental car was repossessed by the rental company for delinquent payments, at which time the police searched the vehicle and found generic cigarettes with "Q" on the butt. A written report was presented at the trial, prepared by a police dispatcher, which recounted a conversation Rahar had with his girlfriend's daughter, telling her not to inform the police about the argument Rahar had with the decedent shortly before his death. The dispatcher could not independently recall the conversation but authenticated her involvement with the report. Rahar knew that the dogs and cat were gone from the decedent's on the day in question, because the decedent informed him of that fact the night before. Testimony established that the dogs barked loudly upon the approach of a person to the home.

Linda Fillback Stevens lived in the neighborhood and stated that she saw the decedent's truck speed past her on the date of the incident. She described the driver as a male with long, blond hair. Multiple patrons and employees of a nearby Amoco gas station observed the decedent's truck drive into a snowy field near the station. The driver stopped, exited the vehicle, and walked in the direction of the neighborhood. No one got a clear look at the driver, but they described the person as a male with long, blond hair. The police found the truck in a field with the ignition coil missing. No photographs or impressions of footprints were taken, nor were fingerprints obtained. The police did not present the witnesses with a photograph lineup. Evidence at the trial illustrated that the decedent's home had woods behind it. It was one-quarter of a mile from the back of the decedent's house to the next marked street. A vehicle with four-wheel-drive capabilities could drive on a dirt road and get behind the decedent's home without being noticed. Also, the field where the truck was found was three-quarters of a mile from the decedent's home if one walked directly through the woods.

Donald Turner was defendant's former brother-in-law. His testimony set up the theory that defendant hired a hit man to kill her husband. Turner testified that, less than two months before the decedent's death, defendant came to see him at a bar where he worked and asked where she could find a hit man to kill her neighbor because he caused the decedent to drink alcohol and use drugs. He informed her that that kind of person did not frequent his bar, and he offhand-edly told her to go to a biker bar in East St. Louis. Turner never heard from defendant on the subject again, but he did tell his ex-wife's boyfriend, Ray Fredericks, about the conversation. In September 1990 Fredericks informed the police of the conversation. The police did not immediately follow up on Fredericks' statement, but when defendant informed the police that she was moving to Missouri, Detective John Betten of Fairview Heights contacted Turner about discussing the subject with defendant again, at which time they would be either au-diotaped or videotaped or both.

Turner contacted defendant and asked her to meet him in the parking lot of the Schnucks grocery store in Swansea. Turner was wired and fabricated a story of needing a hit man to eliminate his bar partner, Jackie. Defendant denied contacting anyone after their previous conversation. Defendant suggested that he do what he told her to do and go to a biker bar in East St. Louis. Turner kept pressing her for help and stated that he knew she paid someone to kill the decedent. Defendant denied the accusation and stated that she would not have been stupid enough to set fires in her own home. Defendant complained

that the insurance company did not pay her enough money to fix the damage to the house caused by the fires. She continued to state that she did not have enough money to pay a hit man and could show anybody where the insurance money had gone. She mentioned that a hit man would cost between $10,000 and $20,000. Turner asked how she knew, and she said, "That's what people say." Defendant told Turner to burn his trailer with Jackie in it and not to inform the arsonists that someone would be in the trailer. After Turner continued to press defendant, she ended the conversation by telling Turner that she would call him and use the name Brittany. She never contacted Turner. On November 28, 1990, Turner called defendant and complained that Jackie had him arrested, and Turner asked for a name and a number for a hit man. He said that he knew she paid someone to kill the decedent. Defendant stated that she could not help, but she agreed to meet Turner at his bar the following Saturday. That Saturday they met at his bar. Detective Betten listened to their conversation in the basement of the bar. Defendant told Turner that she talked to a friend and that no one would touch it because the story sounded like a setup.

Detective Betten took over the investigation after the major case squad disbanded. He had no face-to-face contact with defendant until January 1990. At this point, Detective Betten informed defendant that she was a suspect, and the two discussed the case. Defendant informed Detective Betten of some of her theories. She mentioned that Rahar had a dispute with a previous landlord and threatened to kill him. The former landlord confirmed the argument but could not say whether there was a threat or not. Defendant mentioned another neighbor, Terry Oplt, who denied seeing the decedent two days before his death. Detective Betten stated that he felt that her stories were suspicious. Detective Betten also testified about the bar, Lyle's Knock-Knock Tavern, on Eighth Street in East St. Louis, about three-quarters of a mile from Sauget, the town next to Cahokia. The bar was located about four miles from defendant's dog-grooming shop. The bar had the nickname of "Froggie's," which Turner mentioned to defendant during the Swansea Schnucks conversation, but defendant did not acknowledge the name one way or another. The owner of Lyle's Knock-Knock Tavern, Linda Stevens, testified that Jose Solis, in whose possession the .357-magnum collector's pistol was found, worked as a bouncer at the tavern. She stated that she had never seen defendant in the tavern, and if defendant did visit the establishment, she probably would have been informed of her presence because the tavern required patrons to check in through a peephole in the door.

## II. ANALYSIS

The first issue raised is whether there was insufficient evidence to

warrant a conviction of first-degree murder. Defendant argues that the evidence was entirely circumstantial. Defendant notes that the State had to rely on circumstantial evidence because defendant had an alibi for the estimated period of time during which the murder occurred. Also, defendant claims that the police investigation was poorly conducted with leads not followed, blood work not done, fingerprints not taken, and footprints not taken from the field in which the decedent's truck was abandoned following his murder. Defendant argues that the taped conversations between defendant and Donald Turner might lead one to believe that defendant "more likely than not" hired someone to kill her husband but "more likely than not" is insufficient to convict a defendant in a criminal setting.

■ The State argues that all of theses arguments raised by defendant's brief do not refute the fact that a jury of defendant's peers heard these arguments and found defendant guilty of first-degree murder. Absent clear error on the part of the jury, the reviewing court must not retry the defendant and should defer to the trier of fact. See *People v. Eyler*, 133 Ill. 2d 173, 191, 549 N.E.2d 268, 276 (1989).

■ The standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found that the essential elements of the crime exist beyond a reasonable doubt. See *People v. Byron*, 164 Ill. 2d 279, 299, 647 N.E.2d 946, 956 (1995); *People v. Nitz*, 143 Ill. 2d 82, 95-96, 572 N.E.2d 895, 904 (1991). A criminal conviction will not be set aside unless it is so improbable or unsatisfactory that a reasonable doubt as to defendant's guilt still remains. See *Byron*, 164 Ill. 2d at 299, 647 N.E.2d at 955; *People v. Jimerson*, 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903 (1989). The credibility of a witness, the weight to be given to testimony, and reasonable inferences drawn therefrom are all the provinces for the trier of fact. See *Byron*, 164 Ill. 2d at 299, 647 N.E.2d at 955-56; *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845 (1991).

■ In this case, we find that a rational trier of fact could have found, beyond a reasonable doubt, defendant guilty of first-degree murder. Granted, the State's case is circumstantial, but largely circumstantial evidence can be sufficient to warrant a guilty verdict, and the standard of review is the reasonable-doubt standard, as with direct evidence. See *People v. Pintos*, 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346 (1989); *People v. Anderson*, 237 Ill. App. 3d 621, 632, 604 N.E.2d 546, 553 (1992). It is not the responsibility of the reviewing court to retry the defendant. See *Eyler*, 133 Ill. 2d at 191, 549 N.E.2d at 276. We will not disturb the jury verdict in this case.

■ The second issue on appeal involves an alleged violation of the single-subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV,

§ 8(d)). The constitutionality of a statute is a question of law and is reviewed *de novo.* See *People v. Fisher,* 184 Ill. 2d 441, 448, 705 N.E.2d 67, 71-72 (1998). "[T]he single subject rule ensures that the legislature addresses the difficult decisions it faces directly and subject to public scrutiny, rather than passing unpopular measures on the backs of popular ones." *Johnson v. Edgar,* 176 Ill. 2d 499, 515, 680 N.E.2d 1372, 1379 (1997). Legislative subjects need not be related to one another substantively but, rather, satisfy the rule as long as the subjects included in it have a natural and logical connection. See *Premier Property Management, Inc. v. Chavez,* 191 Ill. 2d 101, 112, 728 N.E.2d 476, 482-83 (2000); *Arangold Corp. v. Zehnder,* 187 Ill. 2d 341, 354-55, 718 N.E.2d 191, 197 (1999). The term "subject" shall be liberally construed in favor of upholding the legislation. *Premier Property Management, Inc.,* 191 Ill. 2d at 112, 728 N.E.2d at 482; *Arangold Corp.,* 187 Ill. 2d at 352, 718 N.E.2d at 198.

■ In order to assess whether Public Act 89—689 passes the single-subject test, we must give a quick overview of the topics that it addresses. Sections 5, 110, and 120 of Public Act 89—689 amend the Criminal Code of 1961. Pub. Act 89—689, §§ 5, 110, 120, eff. December 31, 1996 (1996 Ill. Laws 3775, 3799, 3802) (amending 720 ILCS 5/31—6, 31—7, 12—7.1, 8—1.1 (West 1996)). Sections 20, 65, 100, 115, 125, 130, and 135 amend the Unified Code of Corrections. Pub. Act 89—689, §§ 20, 65, 100, 115, 125, 130, 135, eff. December 31, 1996 (1996 Ill. Laws 3776, 3780, 3793, 3800, 3803, 3808, 3809) (amending 730 ILCS 5/3—4—3, 5—5—3.2, 3—3—5, 5—5—6, 5—5—3.2, 3—2—2, 3—5—1, 3—6—3.1, 3—7—2 (West 1996)). Sections 90 and 105 amend the Code of Criminal Procedure of 1963. Pub. Act 89—689, §§ 90, 105, eff. December 31, 1996 (1996 Ill. Laws 3792, 3798) (amending 725 ILCS 5/104—21 (West 1996) and adding 725 ILCS 5/115—10.2 (West 1996)). Section 35 amends section 8 of the Court of Claims Act by adjusting the awards to be received by a person unjustly imprisoned and subsequently pardoned by the Governor on the basis of innocence. Pub. Act 89—689, § 35, eff. December 31, 1996 (1996 Ill. Laws 3777) (amending 705 ILCS 505/8 (West 1996)). Section 55 amends the Humane Care of Animals Act, creating a crime and defining the punishment for killing or incapacitating a guide dog. Pub. Act 89—689, § 55, eff. December 31, 1996 (1996 Ill. Laws 3778) (adding 510 ILCS 70/7.15 (West 1996) and amending 510 ILCS 70/16 (West 1996)). Section 70 gives a person drawing blood or obtaining urine immunity when that person acts upon the request of law enforcement and the liquid is to be used for evidentiary purposes. Pub. Act 89—689, § 70, eff. December 31, 1996 (1996 Ill. Laws 3783) (adding 625 ILCS 5/11—500.1 (West 1996)). Section 75 amends the Counties Code and deals

with the juvenile impact incarceration program. Pub. Act 89—689, § 75, eff. December 31, 1996 (1996 Ill. Laws 3784) (amending 55 ILCS 5/3—6039 (West 1996)). Section 80 amends the Juvenile Court Act of 1987 by changing the probationary or conditional discharge period for juveniles. Pub. Act 89—689, § 80, eff. December 31, 1996 (1996 Ill. Laws 3786) (amending 705 ILCS 405/5—23 (West 1996)). Section 85 amends the Criminal Identification Act by changing the section dealing with whether certain violations are expunged or not. Pub. Act 89—689, § 85, eff. December 31, 1996 (1996 Ill. Laws 3789) (amending 20 ILCS 2630/5 (West 1996)). Section 95 amends the State Appellate Defender Act by changing the procedure to accept bids and appoint counsel for indigent, noncapital criminal cases. Pub. Act 89—689, § 95, eff. December 31, 1996 (1996 Ill. Laws 3793) (adding 725 ILCS 105/10.5 (West 1996)).

All of the provisions of Public Act 89—689 relate to the criminal justice system. The sections amending the Criminal Code of 1961, the Code of Criminal Procedure of 1963, or the Unified Code of Corrections clearly relate to the criminal justice system. The remaining sections either directly affect criminal justice by creating crimes or punishments or the procedures by which the Illinois criminal justice system operates, such as the compensation due wrongfully imprisoned citizens. They all have a natural and logical connection to the criminal justice system, and accordingly, Public Act 89—689 does not violate the single-subject rule of the Illinois Constitution. See *People v. Jones*, 317 Ill. App. 3d 283, 739 N.E.2d 105 (2000); *People v. Majors*, 308 Ill. App. 3d 1021, 721 N.E.2d 753 (1999); *People v. Dixon*, 308 Ill. App. 3d 1008, 721 N.E.2d 1172 (1999).

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, P.J., and WELCH, J., concur.