(No. 72174.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT BYRON, Appellant.

*Opinion filed January 19, 1995.—Rehearing denied April 3, 1995.*

FREEMAN, J., concurring.

Michael B. Metnick and Richard D. Frazier, of Met-nick, Wise, Cherry & Frazier, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb, Michael Golden and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Robert Byron, was indicted for murder, conspiracy to commit murder, home invasion, and armed robbery. He was tried in a joint trial with codefendant Harold Bean. A jury found them guilty of all charges, and both defendants were sentenced to death. Subsequently, we reversed those convictions and remanded the causes for separate trials because the defenses of the two codefendants were antagonistic. *People v. Byron* (1987), 116 Ill. 2d 81; *People v. Bean* (1985), 109 Ill. 2d 80.

Following the second and separate trials, a jury again convicted the defendants on all counts. Byron waived his right to a jury sentencing and the trial judge again sentenced the defendant to death. This case is now before us on direct appeal by the defendant, Robert Byron. (Ill. Const. 1970, art. VI, § 4(b); Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i); 107 Ill. 2d Rules 603, 606.) The direct appeal of his codefendant, Bean, was previously affirmed by this court. *People v. Bean* (1990), 137 Ill. 2d 65.

Defendant argues that: (1) he was denied his constitutional right to confront witnesses against him; (2) he was denied due process of law by comments the prosecutor made during closing argument; (3) he was denied effective assistance of counsel; (4) he was not proven guilty beyond a reasonable doubt; (5) the State failed to prove that defendant committed murder pursuant to a contract, thereby making him ineligible for the death penalty; (6) his sentence is disproportionate to those of others who participated in the crime; (7) the trial court improperly relied on evidence of defendant's prior drug use during sentencing; (8) the trial court improperly failed to conduct a preliminary investigation of defendant's allegations of ineffective assistance of counsel; (9)

the trial court improperly required defendant to present mitigating evidence to preclude imposition of the death penalty; and (10) the death penalty is unconstitutional. We affirm.

## FACTS

On February 20, 1981, a friend discovered the body of 81-year-old Dorothy Polulach in her home. The victim's arms and legs had been handcuffed and she had been shot twice in the back of the head.

Many were involved in the events which led up to Dorothy's murder. Three of these individuals, Ann Walters, Wayne Walters, and Robert Daniel Egan testified for the State. Ann Walters grew up in Chicago. After her parents divorced, she moved to Florida with her mother. Her father remarried Dorothy Polulach and continued to live in Chicago. Ann hated her stepmother. After her father committed suicide in December of 1979, Ann was angered to learn that her father's will left the bulk of his estate to Dorothy for life. Moreover, Ann was convinced that Dorothy played a role in her father's suicide; Ann referred to Dorothy as "the Black Widow." Ann expressed these thoughts to her old friend, Geraldine Smith, and Smith's ex-husband, Harold Bean, while she was in Chicago for her father's funeral. Bean suggested that they "get rid of" Dorothy.

Ann returned home to Florida. In May of 1980, Smith and Bean drove from Chicago to Florida to attend the anniversary party of Ann and her husband, Wayne Walters. Bean again discussed Ann's father's will. He offered to kill Dorothy for a sum of money. Later in June of the same year, Bean flew down to Florida to discuss details of the murderous proposition with Ann and Wayne. Ann loaned Bean $2,500 to "get the ball rolling."

In early February of 1981, Robert Daniel Egan lived with defendant, who was married to Egan's sister. One

evening, while Bean was visiting defendant, defendant entered Egan's bedroom and asked Egan if he would like to make some money. Defendant told Egan that he would only be required to drive a car and to drop some people off and pick them up. Egan then went into the kitchen and saw Bean. Bean and defendant were friends. Bean told Egan that the plan was "his score" and that there would be "big diamonds and antiques."

On February 17, 1981, the evening of the murder, Bean, Egan and defendant again met at defendant's home. Bean donned a priest's smock with a priest's collar, a black trench coat and a brown wig. The three left for the Polulach residence. At approximately 6:45 p.m., Egan dropped Bean and defendant off a few blocks from the Polulach home, and, pursuant to instructions, drove to a nearby roller skating rink and waited. However, defendant returned to the car 30 to 45 minutes later. He reached under the seat, retrieved a .38-caliber revolver, and explained that they forgot the gun and might need it. Defendant told Egan to drive down the street in about 15 minutes. Egan did so, and he retrieved defendant and Bean as they walked along the street.

On February 18, Ann purchased a plane ticket for Bean and he flew down to Florida. When Ann and Wayne picked up Bean from the airport, he told them details concerning the murder. Bean told them that he had two partners, but he did not mention their names. Bean also informed them that he disguised himself as a priest. Bean took Dorothy upstairs to the second-floor landing and put a gun to the back of her head. However, the gun misfired, so he asked his partner to get another gun. Bean told Ann and Wayne that Dorothy was full of fight and told him he did not have the guts to kill her. Bean shot Dorothy twice. Bean subsequently urged Wayne to borrow $2,000 or $3,000 to pay him, but Wayne refused.

Bean returned to Chicago. Upon his return, he met with Ann, who came to Chicago to attend Dorothy's funeral. He told Ann that his partners were very upset because they were unable to get anything valuable from the decedent's home. Bean told Ann that his partners knew who she was and that if they did not get more money, something bad was going to happen. Bean said one of his partners was "off the wall" because his daughter had run away and the police had been around his house. Bean told her that his partners wanted $10,000. Ann told him that she did not have that much money, but would try to raise $5,000.

The next time Ann saw Bean in Chicago, Bean told her he wanted half the money generated from her father's estate. Ann told Bean that it was not her money; it was her mother's money. Bean said that without him, her mother would not have the money.

About a week after the crime, Egan received a phone call from Bean at defendant's house. Bean wanted Egan to pick him up at O'Hare airport. Egan and defendant drove to O'Hare and retrieved Bean. On their return from the airport, Bean told Egan that "you can add another round to your bag of tricks, a murder." Bean told Egan that he had a lot of money coming. He then described what occurred the night of the murder. Bean told Egan that Dorothy was a "feisty old bitch." Bean said that he just laid her down, handcuffed her behind her back, and "popped" her twice. Bean further stated that the money he would be getting in the future was from Ft. Lauderdale, Florida. Bean told Egan that he would return to Florida a week later to get a $5,000 down payment.

In Florida, Ann borrowed $5,000 from two friends. Bean flew down to Florida to get the money. Wayne told Bean that it was all the money they could give him. Bean assured him that the money would keep his partners quiet.

.

In early April, Chicago Police Detectives Thomas Ptak and Michael Duffin flew to Ann and Wayne's home in Florida. Ann and Wayne confessed to their participation in the crime and were arrested.

Defendant was taken into custody for questioning on April 6, 1981. Egan's sister telephoned him and told him that defendant had been arrested. Egan, Bean, and Bean's girlfriend, Debra Youngbrandt, fled Chicago in Youngbrandt's vehicle. They drove through Illinois, Iowa, and Nebraska before Egan was arrested for a minor traffic violation. Bean and Youngbrandt then returned to Chicago without Egan. Egan subsequently hitchhiked back to Chicago and returned to defendant's house.

On April 22, 1981, Egan was arrested by the Chicago police at defendant's house. On April 23, 1981, detectives arrested defendant. On April 25, 1981, detectives found Bean by a makeshift campsite in a forest preserve, and they arrested him.

At the conclusion of the evidence, the jury returned verdicts of guilty of first degree murder, conspiracy to commit first degree murder, armed robbery, and home invasion. Defendant waived a jury for sentencing. During the eligibility phase of the sentencing hearing, the State argued that defendant was eligible for the death penalty under section 9—1(b)(5) of the Criminal Code of 1961, because defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(5).) The court found that the witness testimony and circumstantial evidence established beyond a reasonable doubt that the aggravating factor was present and defendant was eligible for the death penalty. The trial judge concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty and sentenced defendant to death.

## ANALYSIS

### I. Claims Relating to Defendant's Right to Confront Accusers Against Him

Defendant argues that he was denied his constitutional right to confront his accusers because the trial court erroneously (1) admitted hearsay statements made by a codefendant in regard to the murder plans under the co-conspirator exception to the hearsay rule; (2) admitted out-of-court statements by police officers that defendant's daughter had run away from home following the murder; and (3) admitted testimony by a codefendant who stated that he fled Chicago after learning from his sister that defendant was arrested. We shall examine each alleged error in turn.

Defendant objects to the testimony of Ann Walters, Daniel Egan, and Wayne Walters. Ann Walters was allowed to testify about two major conversations she had with Bean following the murder, during which Bean told her specific details concerning its commission. Similarly, Egan was allowed to testify that Bean informed him of the details of the home invasion and murder. Wayne Walters was also allowed to testify as to the conversations he had with Bean following the murder.

The general rule is that a statement of one coconspirator is admissible against the others as an admission only if the statement was made during the course of and in furtherance of the conspiracy. (*People v. Davis* (1970), 46 Ill. 2d 554.) A statement which is merely a narrative of past occurrences will not fall within the coconspirator exception if it does not further any objective of the conspiracy. *People v. Miller* (1984), 128 Ill. App. 3d 574, 585.

Defendant first complains that the statements admitted were not made during and in furtherance of the conspiracy. This assertion might be compelling if the con-

spiracy ended with Dorothy Polulach's death. However, it did not. The ultimate goal of the conspiracy was for defendant, Byron, and Egan to obtain money from Ann and Wayne Walters as payment for the murder of Dorothy Polulach. The conversations which Bean had with the Walterses and Egan following the murder were coolly calculated to further these financial interests. Bean had to convincingly and irrefutably demonstrate to the Walterses that he had succeeded in his task and he did so by relating what occurred during the murder. These recitations were inextricably intertwined with his continued requests for money. Therefore, the trial judge did not err in admitting testimony concerning these conversations.

Defendant also objects to the admittance of Egan's testimony which recounted his conversation with Bean during their return from O'Hare airport. He argues that Egan did not conspire to kill Polulach for the proceeds from her estate, and therefore Bean was merely narrating past events. In support of his argument, defendant cites *People v. Parmly* (1987), 117 Ill. 2d 386, in which this court held that when the primary goal of the conspiracy is completed, any subsequent goal, such as concealment, could not serve as a basis to admit the statements. *Parmly* is inapplicable to the case at bar because the statements the court found inadmissible in that case occurred the day after the object of the conspiracy—the robbery—was completed. It is irrelevant whether, as defendant suggests, Egan did not have knowledge of the continuing conspiracy to extract money from the Walterses for the murder. The only way that these statements could be rendered inadmissible is if we were to agree with defendant that he was unaware of Bean's scheme with respect to the Walterses. Defendant insists that no evidence was admitted which suggested he was privy to this aspect of the conspiracy.

This assertion will not bear scrutiny. Neither defendant nor Bean testified during the jury trial, and we will never know the substance of their private conversations or mental impressions around the time of the murder. Similarly, we do not have Dorothy Polulach available to testify that it was indeed defendant and Bean who killed her. We do know, however, that Ann and Wayne Walters testified that they entered into an agreement with Bean whereby Bean agreed to kill Dorothy Polulach for a fee. Egan's testimony linked defendant to the conspiracy; he testified to the events the night of the murder. Moreover, Egan testified to his conversation with Bean and defendant on their return from O'Hare airport, in which Bean told him the details of the murder and of the monetary reward he would receive for his participation in it. Egan's testimony was not improbable; he told a credible story of a well-planned conspiracy. The trial judge was convinced that the totality of the witness testimony establishing the relationship between Bean and defendant and their cooperation in carrying out the crime revealed that defendant was well aware of the entire monetary scheme. No other reasonable conclusion could have been reached.

Defendant next attacks the admission of the officers' testimony in reference to defendant's daughter. Early in the trial, Ann Walters testified that Bean told her that one of his partners was "off the wall" because the police had been around that partner's home asking questions about his daughter, who had run away. Seeking to enhance Ann Walters' credibility and directly tie defendant to the murder, the prosecution called two police officers who also testified about the missing daughter. Officer John McCarthy testified that on February 26, 1981, he was dispatched to defendant's residence to investigate a missing-person report. He was further allowed to testify that when he arrived, defendant's wife told him

that their daughter, Margaret, had run away. Detective Thomas Ptak testified that, following the arrest of the Walterses, he returned to Chicago and began searching through police missing-person reports. He testified that he found a missing-person report on Margaret Byron. Defendant asserts the trial judge erred in admitting the officers' testimony because it was hearsay.

Our review of the record indicates that defendant's challenge to the testimony of Officer McCarthy and Detective Ptak has been waived. It is well settled that both a trial objection and a written post-trial motion raising the issue are required to preserve an alleged error for review. (*People v. Enoch* (1988), 122 Ill. 2d 176.) Although defendant concedes that Officer McCarthy is not specifically mentioned in defendant's post-trial motion, he nonetheless argues that the motion specifically objects to the same evidence introduced through the testimony of Detective Ptak. The motion states:

> "The court erred by allowing Detective Ptak to testify that, sometime after the incident, he was looking for Robert Byron. This testimony suggested that Byron had been implicated by someone. The testimony amounted to the introduction of a hearsay statement by a third-party."

Although this paragraph mentions Detective Ptak's name and "hearsay," it lacks specificity and, thus, does not preserve defendant's challenge to the testimony concerning defendant's daughter.

Nor will we consider defendant's objection to this testimony under the plain error doctrine. The plain error doctrine permits a reviewing court to consider a trial error not properly preserved when (1) the evidence in a criminal case is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209-10; 134 Ill. 2d R. 615(a).) Neither circumstance exists here.

Defendant next contends that the trial court erred

by allowing Egan to testify that on April 6, 1981, his sister, Karen, the defendant's wife, phoned to inform him that the police had arrested defendant. Egan further testified that he, Bean, and Bean's girlfriend, Debbie Youngbrandt, fled Chicago following defendant's arrest. During closing argument, the prosecutor used this information to argue that the flight of Egan and Bean indicated that they were accomplices of defendant and thus defendant was guilty.

We find that defendant has waived any objection to the admission of this testimony by failing to properly preserve the issue for review. Defendant asserts that he objected to this testimony in his post-trial motion, which states:

> "The court erred by allowing Detective Ptak to testify that, sometime after the incident, he was looking for Robert Byron. This testimony suggested that Byron had been implicated by someone. The testimony amounted to the introduction of a hearsay statement by a third-party."

This paragraph is not even tangentially related to Egan's testimony concerning his flight after defendant's arrest.

As noted in *People v. Enoch* (1988), 122 Ill. 2d 176:

> " 'Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance.' " (*Enoch,* 122 Ill. 2d at 186, quoting *People v. Caballero* (1984), 102 Ill. 2d 23, 31-32.)

This court went on to observe:

> "[O]ur constitutional obligation to review death penalty cases does not require us to review every issue raised on appeal when the issues are not properly preserved by an

objection in the trial court and a written post-trial motion." *Enoch*, 122 Ill. 2d at 190.

Frequently, defendant's trial and appellate counsel are different. Equally competent counsel may differ in their approach to each case. A court of review should not give deference to defendant's challenges premised on nothing other than appellate counsel's different viewpoint regarding trial counsel's strategic performance. Where an alleged error has been waived, the threshold inquiry must rise to the level of plain error or ineffective assistance of counsel. Neither circumstance exists here.

## II. Claims Relating to the Prosecutor's Closing Argument

The defendant claims that the prosecutor's closing argument violated his due process rights. The defendant specifically finds fault in (1) the prosecutor's claim that the State's three chief witnesses had given prior consistent statements to the police when these statements were never admitted into evidence and (2) the prosecutor's comments regarding the changed appearance of the defendant.

Initially, it must be noted that the defendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument. Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. (*People v. Pasch* (1992), 152 Ill. 2d 133, 185.) The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Smothers* (1973), 55 Ill. 2d 172, 176.

Applying these principles to the present case, we cannot find that the defendant was substantially prejudiced by the prosecutor's closing arguments. The prosecutor's remarks were brief, isolated, and came after the jury had already heard an abundance of evidence regarding the defendant's guilt. The jury heard testimony from Ann Walters, Wayne Walters, and Daniel Egan individually. This testimony interconnected and strongly implicated the defendant in the murder. It was not, therefore, substantially prejudicial for the prosecutor to allude to the consistency and interconnectedness of previous statements made by these three individuals, especially when the existence of these statements was testified to at trial.

Defendant also objects to comments made by the prosecutor during closing argument concerning defendant's changed appearance. The prosecutor stated:

> "The fellow sitting right here, Ladies and Gentlemen, is Mr. Robert Byron in many forms. Back in 1980, when it was important for him to give a good image, he lied to the landlord, and lied to the phone company about his dead beat record, and calls himself John Neal. *** Now, Ladies and Gentlemen, when he is facing trial for murder when he is looking at 12 strangers who don't know very much about him, he pretends, grows a beard, puts on glasses.
>
> DEFENSE COUNSEL: Objection. Objection. Objection.
> THE COURT: Overruled.
> PROSECUTOR: Looks like the county jail librarian because that's not what a murderer is suppose to look like. Everyone of them is on trial, Robert Byron, the deceiver, the liar, the pretender, the home invader, the armed robber, the murderer."

Defendant cites *People v. Emerson* (1983), 97 Ill. 2d 487, as authority for the proposition that such argument is impermissible and requires reversal. In *Emerson*, this court reversed a conviction where, during closing argument, the assistant State's Attorney insinuated that the defendant was guilty of improper conduct at the time of

his arrest; stated that defense counsel has laid down a smokescreen "composed of lies and misrepresentations and innuendoes" and attempted to "dirty up the victim" to distract the attention of the jury from the defendant's crimes; and stated that if they could, defense counsel would deny that any death occurred, but since they could not realistically do that, they had to "make something up." *Emerson*, 97 Ill. 2d at 496-98.

The distinctions between *Emerson* and the present case are evident. The prosecutor, unlike in *Emerson*, did not allege that defense counsel had deliberately lied to the jury and fabricated a desperate defense. In short, the impermissible closing arguments in *Emerson* were different in both substance and degree. Thus, these isolated remarks cannot be said to have sufficiently prejudiced defendant so as to require reversal of his conviction.

### III. Claims Relating to Ineffective Assistance of Counsel

The defendant next claims that he was denied effective assistance of counsel because his counsel (1) failed to object to the hearsay testimony from two police officers which established that the defendant's daughter had run away during the time period the murder was committed and (2) failed to object to the prosecutor's closing argument comments concerning the prior consistent statements of the Walterses and Egan.

In order to evaluate ineffectiveness of counsel claims, this court follows the two-part test set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (See *People v. Albanese* (1984), 104 Ill. 2d 504 (adopting *Strickland* standard).) First, the defendant must show that his counsel's performance "fell below the objective standard of reasonableness." Second, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The defendant cannot meet the first prong of the *Strickland* test. We do not think that it was unreasonable for defense counsel to fail to object to the alleged hearsay statements. Our review of the record indicates that defense counsel did object to the testimony of Officer McCarthy, but did not object to the testimony of Officer Ptak. Officer Ptak merely testified to his investigatory procedures; his testimony was not hearsay. Further, since the existence of the Walterses' and Egan's prior statements was testified to at trial, the prosecutor, in his closing argument, was allowed to make reasonable inferences from them. Defense counsel cannot be deemed incompetent for choosing not to object to those remarks.

However, even if one were to conclude that defense counsel should have objected to this testimony, the failure to do so would not rise to a *Strickland* level error. The defendant argues that in *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, the Supreme Court "noted" that a single error by defense counsel at trial may be sufficient to constitute ineffective assistance of counsel. This creative reading of *Cronic* is belied by other language from the same opinion:

> "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." *Cronic,* 466 U.S. at 656, 80 L. Ed. 2d at 666, 104 S. Ct. at 2045.

Our review of the record indicates that the defen-

dant was represented by skilled, conscientious defense counsel. We decline the defendant's invitation to hold otherwise.

IV. Claims Relating to State's Failure to Prove
Defendant Guilty Beyond a Reasonable Doubt

The defendant argues that the State failed to prove him guilty beyond a reasonable doubt. The defendant contends that the State's entire case rested upon the testimony of Robert Daniel Egan and that Egan is not credible because of his extensive criminal record.

A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Jimerson* (1989), 127 Ill. 2d 12.) Determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Steidl* (1991), 142 Ill. 2d 204.) On review, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Nitz* (1991), 143 Ill. 2d 82.

Applying the foregoing principles to the case at bar, it becomes evident that the defendant's argument must fail. Even assuming, *arguendo*, that Egan's testimony constituted the prosecution's entire case, we shall not reverse a conviction simply because the defendant tells us that a witness was not credible. That determination is the province of the jury, and we shall not invade it. In the present case, the jury was well aware of Egan's extensive criminal record and yet chose to believe his testimony. We see no reason to question the jury's judgment or ability in this regard.

### V. Claims Relating to the Failure to Prove the Conspiracy

Defendant asserts that the prosecution failed to prove that he committed the murder pursuant to a contract, agreement or understanding. Section 9—1(b)(5) of the Criminal Code of 1961, under which the trial court sentenced the defendant to death, states that a defendant is eligible for the death penalty if:

"The defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder or procured another to commit the murder for money or anything of value." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(5).)

Defendant contends that there was no evidence that he knew he was involved in a murder pursuant to a contract, agreement or understanding. At the most, the defendant argues, the State proved that he shared in the proceeds of a residential burglary which was committed in conjunction with the murder.

We reject defendant's contentions. Defendant intimates that because the prosecution failed to introduce direct testimony establishing defendant's knowledge of the contract, it has not sustained its burden of proof. This intimation is baseless. The testimony of Daniel Egan, Ann Walters and Wayne Walters was sufficient to show that defendant joined the conspiracy long before the murder was committed, and agreed to assist Bean in the murder, with the understanding that all of the participants would share the proceeds of any goods recovered from the victim's home and any money obtained from Ann and Wayne directly and through the victim's estate.

Defendant further contends that even if the State established that he was well aware of the contract prior to Dorothy's murder, the plain language of section 9—1(b)(5) requires the State to prove that the defendant himself entered into the contract and actually committed the murder. Stated differently, defendant argues

that the legislature intended only for the principal contract killer to be eligible for the death penalty, and not his accomplice. In support of this argument, defendant points out that where the legislature intended to allow principles of accountability or conspiracy to make an individual eligible for the death penalty, it specifically states so in the relevant section. For instance, section 9—1(b)(6)(a), the felony-murder death eligibility section, provides:

"(6) the murdered individual was killed in the course of another felony if:

(a) the murdered individual:

(i) was actually killed by the defendant, or

(ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable under Section 5—2 of this Code, and the physical injuries inflicted by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)(a).)

Defendant further cites *People v. Chandler* (1989), 129 Ill. 2d 233, for the proposition that penal statutes should be strictly construed in favor of the accused, and argues that a strict construction of section 9—1(b)(5) should thus preclude the imposition of the death penalty.

Defendant concedes that his argument is undermined by this court's decision in *People v. Ruiz* (1982), 94 Ill. 2d 245, but he asks us to overturn the decision in that case. In *Ruiz*, defendant was sentenced to death under section 9—1(b)(6), the multiple-murder eligibility provision. Defendant argued that since there was no evidence that he actually took the knife and committed the killings, he could not be sentenced to death, because the Illinois statute providing for the death sentence was not intended to be applied to those persons found guilty of murder under the theory of accountability. This court

rejected defendant's argument. It noted that section 9—1(c)(5) lists, as a mitigating factor, "the defendant was not personally present during the commission of the act or acts causing death." This court reasoned that if the death penalty was not intended to apply to defendant's conviction by accountability, this "absence of presence" mitigating factor would be rendered superfluous.

Notably, the *Ruiz* defendant made the same argument as defendant in the present case concerning legislative intent and the felony-murder statute. (*Ruiz*, 94 Ill. 2d at 260.) In response, the *Ruiz* court stated that the legislature drafted the felony-murder statute so as to avoid the possibility of a person's being put to death without having possessed even the general intent for the crime of murder. *Ruiz*, 94 Ill. 2d at 261.

We continue to adhere to the rule established in *Ruiz* and hold that accountability is not incompatible with the death penalty in cases other than felony murders. We also decline defendant's invitation to hold that, because section 9—1(b)(5) states "*committed* the murder pursuant to a contract, agreement, or understanding" (emphasis added), principles of strict construction require us to find that only the person who pulled the trigger can be sentenced to death. Such a holding would take strict construction to new heights of absurdity.

### VI. Claims Relating to the Proportionality of the Sentence

Defendant next contends that the death sentence imposed upon him is grossly disproportionate to the prison sentences of 25 and 7 years imposed upon Ann and Wayne Walters, respectively, and is grossly proportionate to the death sentence imposed upon Bean.

This contention is without merit. Codefendant Bean attempted to raise an identical argument in his second

appeal to this court. (*People v. Bean* (1990), 137 Ill. 2d 65.) Ann Walters pleaded guilty to first degree murder and received a sentence of imprisonment of 25 years. (See *Bean*, 137 Ill. 2d at 136.) Wayne Walters negotiated with the prosecution and pleaded guilty to conspiracy, for which he received a seven-year sentence. See *Bean*, 137 Ill. 2d at 136.

Defendant was more culpable than Ann Walters and Wayne Walters. We are mindful that defendant had the final opportunity to show some mercy towards Dorothy Polulach. He chose not to do so, and deliberately returned to the car to retrieve the gun which was subsequently used to kill her. Further, the proportionality of the defendant's and Bean's sentences persuades us that defendant's sentence was neither arbitrary nor capricious. Defendant also makes much of the fact that Bean's participation in the murder scheme was greater than his participation. Bean, of course, was also sentenced to death. Whether Bean's actions were arguably slightly more reprehensible than defendant's does not render defendant himself ineligible for the death penalty.

### VII. Claims Relating to the Trial Judge's Reliance Upon Defendant's Drug Use in the Sentencing Phase

Defendant claims that the trial judge's reliance on allegedly incorrect information about his drug use in the presentence investigative report violated his fifth amendment right against compelled self-incrimination and sixth amendment right to counsel. Defendant claims that he requested the presence of counsel at his presentence interview, but that this request was ignored by the presentence investigator.

At the aggravation and mitigation stage of the sentencing hearing, the trial judge noted that the defendant had abused drugs, stating:

"THE COURT: You talk about your wife being on

drugs. Oh, she is a terrible person, she was on drugs. You married her in about 1967 I believe. What were you? You were on drugs also. In 1974 after you were in the penitentiary you were receiving drug treatments. You were on drugs and she was on drugs and you are both rotten parents."

Defendant subsequently told the trial judge that the presentence investigative report, which indicated that defendant used speed, cocaine, heroin, PCP and amphetamines, was incorrect.

We do not agree with defendant that the trial judge's reliance on the allegedly incorrect statements concerning defendant's drug use in the presentence investigative report was constitutionally significant. The defendant denied the accuracy of the report. Further, the trial judge's isolated comments on this matter were in response to defendant's continued assertion that he was a good father. In this regard, the trial judge observed that he had been in prison for most of his children's lives.

### VIII. Claims Relating to Trial Court's Failure to Conduct an Investigation into Defendant's Post-Sentencing Allegations That He Received Ineffective Assistance of Counsel

During defendant's post-sentencing hearing, he informed the judge that he believed he was not given the effective assistance of counsel during the aggravation and mitigation phase of the death penalty hearing. Specifically, defendant stated that he submitted 15 mitigation witnesses to defense counsel, and that defense counsel only phoned these witnesses and told them that if they wanted to testify, they should meet him at the courthouse one-half hour prior to the commencement of the sentencing hearing. Defendant also alleged that his trial counsel told his mitigation witnesses that their testimony was irrelevant because the judge was going to sentence defendant to death. The trial court did not

conduct a preliminary investigation to determine the potential merit of defendant's allegations.

Defendant cites *People v. Nitz* (1991), 143 Ill. 2d 82, to support his contention that the trial judge should have conducted an evidentiary hearing. In *Nitz*, defendant asserted that his trial counsel failed to call two alibi witnesses to testify on his behalf. This court held that the trial court should have appointed new counsel to represent the defendant to conduct an evidentiary hearing to determine the defendant's trial counsel's effectiveness. Notably, however, in that case, this court also held that the trial court's failure to do so was harmless beyond a reasonable doubt. *Nitz*, 143 Ill. 2d at 135.

*Nitz* does not hold, and we are not now prepared to hold, that a trial judge is required to conduct an evidentiary hearing merely because a defendant declares that he was denied the effective assistance of counsel. In the present case, the trial judge was not required to do so because he properly concluded that defendant's claim was without merit. Defendant's trial counsel presented five mitigation witnesses at defendant's sentencing hearing, including his brother, sister, children and a Catholic chaplain. Defense counsel's decision to call five mitigation witnesses rather than 15 is no indication of incompetence. Moreover, we note that this court has repeatedly held that defense counsel's failure to introduce mitigation evidence at a death penalty hearing does not necessarily constitute ineffective assistance of counsel. (*People v. Hampton* (1992), 149 Ill. 2d 71.) As a result, we cannot find that the trial judge erred in this regard.

IX. Claims Relating to the Trial Court's Understanding of the Burden of Mitigation Evidence

Defendant assails some statements the trial court judge made while he sentenced the defendant. Specifically, the trial judge stated:

"I am looking for something good about you. I am having a difficult time because I have to find something in mitigation sufficient to preclude the death penalty. I have listened to your witnesses. I have looked at your background and I listened to you quite a while as you blamed everybody in the world but yourself. You were a criminal as a youth. You were put in institutions for your crimes. When you became an adult, again you just kept committing crimes."

These extemporaneous remarks, suggests the defendant, indicate that the trial judge possessed a fundamental misconception of mitigating evidence and that the trial judge improperly placed the burden of persuasion on defendant to introduce evidence which would preclude the death penalty.

We find that defendant has waived his meritless challenge to the trial judge's remarks. He did not object to them in the trial court; he did not object to them in his post-trial motion; he did not object to them in his opening brief; he did not object to them in his reply brief. Rather, he objected to them for the first time in a supplemental brief filed one year and seven months after his opening brief was filed with this court. This exemplifies the process of "comb[ing] the record for every semblance of error" which this court faulted in *People v. Caballero* (1984), 102 Ill. 2d 23, 31-32. The objection having been waived, we will not consider defendant's argument under these circumstances.

## X. Claims Relating to Constitutionality of the Death Penalty

Defendant's final contention is that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation evidence. This court has repeatedly rejected this argument. (*People v. Burrows* (1992), 148 Ill. 2d 196, 259-60.) We continue to adhere to the firmly established principle that the Illinois death penalty is constitutional.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentence of death. We hereby direct the clerk of this court to enter an order setting Tuesday, May 16, 1995, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution wherein the defendant is now confined.

*Affirmed.*

JUSTICE FREEMAN, concurring:

With the exception of the majority's treatment of defendant's claim concerning Egan's co-conspirator testimony, I agree with the analysis and result in this case. I write separately to address that claim.

As the majority correctly notes, a statement of one co-conspirator is admissible against the others as an admission if made during the course of *and* in furtherance of the conspiracy. (164 Ill. 2d at 290.) Statements made in furtherance of the common design are those that had the effect of advising, encouraging, aiding, or abetting its perpetration. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 802.10 (6th ed. 1994); *People v. Howard* (1991), 209 Ill. App. 3d 159, 187; *People v. Miller* (1984), 128 Ill. App. 3d 574, 585.

Egan testified that defendant told him that he would be receiving "a lot of money." (164 Ill. 2d at 288.) This statement, made during the period when defendant was yet attempting to obtain money from Walters for the murder, was clearly made during the course of the conspiracy. Further, as the statement had the potential of assuring Egan's continued cooperation and concealment

of the murder, the statement was conceivably in further-ance of the conspiracy. Thus, this portion of Egan's testimony was properly admitted under the co-conspirator exception to the hearsay rule. Egan's other testimony concerning defendant's comments, however, does not fit within the exception and should not have been admitted.

Specifically, as the majority recites, Egan testified that defendant described to him, with particularity, the details concerning the home invasion and murder. (164 Ill. 2d at 292.) These statements, though made to Egan during the continuing course of the conspiracy, did not serve to further any purpose of the conspiracy. They were merely a narrative of past events. As this portion of defendant's statements to Egan was not in further-ance of the plan to commit the murder or to receive compensation therefor, they should not have been admitted.

Notwithstanding the impropriety in the admission of this portion of Egan's testimony, defendant was not prejudiced. It appears that the statements were merely cumulative of other properly admitted co-conspirator testimony concerning the details of the murder. See *Howard*, 209 Ill. App. 3d at 187 (holding that although the State failed to show how comments by one co-conspirator were in furtherance of the conspiracy, error in their admission was harmless where it could not rea-sonably have affected the verdict).