2020 IL App (2d) 170945-U
No. 2-17-0945
Order filed April 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-2737 |
| DEMARIO B. THOMPSON, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying, after a preliminary inquiry, defendant's *pro se* motion arguing ineffective assistance of trial counsel.  Affirmed.

¶ 2    On June 19, 2017, a jury convicted defendant, Demario B. Thompson, of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and aggravated discharge of a firearm into a building (720 ILCS 5/24-1.2(a)(1) (West 2016)).  The court sentenced defendant to 75 years' and 15 years' imprisonment, respectively, and denied his motion to reconsider the sentence.  In this direct appeal, defendant raises one issue:  whether, during a preliminary inquiry into defendant's claims of ineffective assistance of trial counsel, as outlined in *People v. Krankel*, 102 Ill. 2d 181 (1984), the

court committed reversible error by ruling on the merits of the ineffective-assistance claims. For the following reasons, we reject defendant's argument and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                         A. Pretrial

¶ 5    The charged offenses took place on September 27, 2016, when defendant (nickname "Sonny") allegedly shot and killed Lanair Sullivan (nickname "L"). Before trial, the State listed Kevin Croom as a potential and "material witness." According to an affidavit in support of a search warrant, Croom, just prior to the shooting and at the scene, allegedly sold "Sonny Mae" cannabis. At hearing on a State motion *in limine*, however, the assistant State's Attorney commented that: "Croom is one of the witnesses [defendant] bought weed from. He is also a witness that's been subpoenaed to court. And so I believe that Kevin Croom would say[,] though[,] that his statements would be that he sold weed to Corlisha [Davis,] *not* that he's going to admit to selling weed to the defendant." (Emphasis added.) Croom was not, ultimately, called as a trial witness.

¶ 6                                          B. Trial

¶ 7    Corlisha Davis testified at trial that she had been friends with defendant and Sullivan since high school. On September 27, 2016, defendant, wearing a white t-shirt and driving a red, Chevrolet Impala, picked her up at the Blackhawk housing authority complex in Rockford, and they drove around and smoked marijuana. Between 6 and 7 p.m., they returned to Blackhawk and saw some of Davis's friends outside, including Keon Winford. Defendant pulled the car forward a "couple of car lengths," when he and Davis saw Sullivan, who was standing next to Winford. Defendant started "patting himself," exited the car, dropped his phone and identification, and picked them up. He and Sullivan then looked at each other, and Sullivan started to run. Defendant

chased Sullivan and shot him in the back. Sullivan was on the ground, trying to crawl away, when defendant shot him about seven times from around two or three feet away. Defendant, while running back to the Impala, continued to shoot the gun toward Sullivan. There were 40 or 50 people outside; they all started running and screaming.

¶ 8 Davis testified that, when defendant returned to the car, he said things like, "fuck that nigger, it could have been me." Defendant showed Davis his gun and pulled out the clip, telling her that, out of 15 bullets, he had only 2 remaining. When Davis exited the vehicle, defendant "sped out." She identified defendant in court as the person she saw shoot Sullivan, as well as a picture of the red Impala she was sitting in during the shooting. Davis testified that, the day after the shooting, defendant, with two other men, came to see her at work and told her that: he knew that people were talking; he hated "snitches;" his "people" would be at court; and they would know "who to take care of." Then, the next day, defendant came to her house and told her not to say anything to the police and to let them "do their job." In addition, defendant called her a few times to make sure "nothing was being said." Davis did not mention defendant visiting her work in her written statement.

¶ 9 Winford had a prior criminal history and had previously entered into a plea agreement with the State; however, his plea agreement did not relate to his testimony in this case. He testified that he and Sullivan were friends for seven or eight years. At the time of the shooting, Winford was standing near Sullivan and saw a red Chevrolet arrive; a car light came on in the car, and he saw Davis. He could not see who the driver was, but there appeared to be smoke passed between the driver and Davis. Winford saw someone get out of the car, heard gunshots, and dropped to the ground. While Sullivan was on the ground, Winford saw a man with "brown skin" and wearing a white t-shirt run toward the red car. He could not identify the person because he only saw the

person's back. In his written police statement, Winford claimed that he was "pretty sure" that "Sonny" was in the car, but he could not see his face. He did not know defendant or whether he was known as "Sonny." According to a detective, when Winford was shown a photo lineup and asked whether he "recognized anyone," he identified defendant and Davis, immediately pointing to defendant and saying "[t]hat's Sonny."[1]

¶ 10    Kevin Cooper testified that, on October 7, 2016 (after the shooting), he was in a car with defendant and some other people, driving to Madison, Wisconsin. They were partying, and Cooper had been drinking heavily. During the drive, defendant told Cooper that he had shot someone. On December 19, 2016, Cooper gave detectives a written statement, in which he said that, during the road trip, defendant told Cooper that he shot "L" (*i.e.*, Sullivan) over "some dope," that he got out of the maroon-colored Chevrolet Impala, dropped his phone, Sullivan ran, defendant shot him in the back "quite a few times," and then defendant ran back to the car. Defendant said he threw the gun "in the river."

¶ 11    Cooper was on probation when he testified. The State agreed to reimburse him for his travel expenses and pay him a $20 witness fee. He did not appear on the first three days of trial and, when the State contacted him regarding his subpoena, Cooper emailed that he felt that the State was "forcing" and "threatening" him by telling him that, if he did not come to court, a warrant would issue. He received a rule to show cause, and his probation officers told him it would be a violation of probation if he did not sign it; however, the petition would be dismissed after his testimony was complete.

---

[1] Although not raised at trial, in his written statement, Winford mentioned that Croom approached the passenger side of the car and talked to Davis before walking away again.

¶ 12    On cross-examination, Cooper testified that, in his emails to the State, he mentioned that he did not "remember anything" because the case was around one year old.  Defense counsel probed Cooper's memory issues and drug and alcohol use.  Cooper testified that he used to be a heavy drinker and drug user and would sometimes "blank out," but that he did not use anymore.  Cooper was undergoing "recognition therapy" as part of his probation.  Counsel asked whether Cooper had told the State that he felt it was trying to bribe him with money and whether he asked the State to just tell him what to say, and Cooper testified that he was just being a "smart aleck" when he wrote those things.  He denied that his probation officer told him that he would be locked up if he did not appear in court.

¶ 13    On re-direct, Cooper testified that his testimony concerning defendant's admission was truthful and that he did not receive a deal or any other consideration from the State for his written statement or testimony.  A detective testified that, when he met with Cooper and took his statement, he told Cooper that he could not make him any promises regarding his current criminal cases, but that he would let the State know about his cooperation in this case.

¶ 14    Two other witnesses testified for the State concerning the events surrounding the shooting, but neither directly identified defendant as the shooter.  Defendant did not testify, but called three witnesses.

¶ 15    In closing argument, defense counsel challenged Davis's credibility, noted that the State failed to call numerous witnesses that were allegedly present at the scene and that other witnesses called could not identify defendant as the shooter.  Counsel argued that, on account of excessive drug and alcohol use, Cooper also lacked credibility, as even he testified that he could not always remember things and that he was drinking when defendant allegedly made his admission.  Moreover, counsel repeated that Cooper had accused the State of bribing him for his testimony,

but then claimed he was just "being funny." Finally, counsel noted that no weapon was found, and no physical evidence, such as DNA or fingerprints, tied defendant to the crime.

¶ 16    As previously noted, the jury convicted defendant of first-degree murder and aggravated discharge of a firearm into a building. The court denied defendant's motion for a new trial.

¶ 17    Prior to the sentencing hearing, the court asked defendant if he was satisfied with defense counsel's representation and he replied, "Yes, sir." The court sentenced defendant to 75 years' and 15 years' imprisonment, respectively, and denied his motion to reconsider the sentence.

¶ 18                              C. *Krankel* Hearing

¶ 19    On November 21, 2017, after his motion to reconsider was denied, defendant informed the trial court that he had prepared a motion alleging ineffective assistance of trial counsel, Glenn J. Jazwiec. The court allowed defendant to read the motion aloud, in which defendant first alleged that counsel was ineffective for failing to thoroughly cross-examine Cooper with the entirety of his email, instead of just a portion of it. Defendant noted that Cooper asserted that defendant had confessed to him, but the entirety of the email reflected that the State was pressuring Cooper to commit perjury. Defendant asserted that Cooper quoted the Bible in his email to the State, and that "you should not pervert justice. You shall not show partially nor take a bribe for a bribe, blind the eyes of the wise and twist the words of the righteous. I'm tired of you all threatening me saying if I don't testify, you all are gonna violate my probation and lock me up." Defendant argued that Cooper essentially was making clear that the State wanted him to commit perjury and that adequate cross-examination required presentation of the entire email.

¶ 20    Defendant next alleged that counsel was ineffective for failing to call Croom on his behalf. He noted that the State had listed Croom as witness but did not call him. Defendant asserted that he asked Jazwiec to call Croom, because Croom would testify that: he did not sell defendant

marijuana and that defendant did not commit the shooting. Defendant asserted that Croom could have testified that the police and the State harassed him and threatened his freedom by pressuring him that, if he did not testify, it would "lock him up and give him a higher bond." Defendant asserted that he asked Jazwiec to call Croom, because he could be an alibi witness and testify that defendant was not the shooter. Defendant concluded, "[p]rejudice is met here because [by] not calling this alibi witness we have an innocent man in prison for a crime he did not commit. Had a reasonable level [of] pretrial investigation been done and the trial counsel put on the stand the witness, the outcome of this trial would have been different."

¶ 21    In light of defendant's allegations, the court announced it would conduct a short hearing pursuant to *Krankel*, without input from the State, concerning his allegations. The court asked Jazwiec whether he had any non-adversarial comments that he would like to make concerning defendant's two ineffective-assistance allegations. As to Cooper, Jazwiec stated that he cross-examined Cooper on many contents of the email. Further, counsel recalled that there had been discussions with the court concerning which portions of the email would be admissible and counsel's decision about which parts thereafter to examine constituted his trial strategy. In addition, counsel commented, "[i]f the Court recalls, also Mr. Cooper when he testified had a— his own way of answering questions where sometimes he would answer more than you would have hoped for him to answer as far as being responsive to the question. So I believe that I effectively cross-examined Mr. Cooper in regards to that email and I did cite forth many of the contents of that email."

¶ 22    As to Croom, Jazwiec explained that defendant was cooperative with trial preparations, provided insight, and, after they discussed how each witness might harm or benefit his case, was in agreement with his decisions about who to call to testify. Jazwiec stated that he did not ignore

any specific request to call Croom as a witness. He reiterated that Croom was originally listed as a State witness, because he placed defendant at the scene at the relevant period. Jazwiec explained that the decision to not call Croom was "a matter of trial strategy and quite frankly, your Honor, I believe that if Mr. Croom was called he would have had more of a benefit for the State than the defendant in this matter."

¶ 23 The court asked defendant whether he had any response to Jazwiec's comments. As to Croom, defendant stated that, when the State decided that it would not call Croom, defendant asked Jazwiec if he could call him as a witness and that he needed Croom as his witness. Jazwiec responded that all that Croom would say was that defendant did not buy marijuana from him.

¶ 24 As to Cooper, defendant stated that, when he had asked Jazwiec why he did not read the entire email to the jury, Jazwiec responded that he did not need to read it word-for-word, as long as he "broke it down." Defendant stated that he believed that it would have helped him if counsel had read the entire email.

¶ 25 The court asked defendant multiple times whether he had any other claims or wished to say anything else about his allegations. The court then summarized defendant's claims, noted that it had allowed him to further explain and develop them, and that it had heard briefly from trial counsel. In addition, the court noted that "the Court having sat as the trial judge throughout the course of the jury trial itself is entitled to rely on its own recollection of both the evidence presented at trial as well as its own knowledge of counsel's performance having sat as the trial judge in connection with that case in order to determine if the defendant's claims of ineffective assistance are without merit or raise only matters of trial strategy." The court found that defendant's claims pertained to trial strategy—specifically, concerning the scope of cross-examination of one witness and failure to call a witness—and were, ultimately, counsel's decisions to make. Further, the court

found that defendant had not specifically articulated prejudice from the alleged errors, in terms of how the verdict against him would have differed. The court stated that the two "claims themselves with respect to those two individual witnesses are *without merit on the overall evidence produced in the case*." (Emphasis added.) The court denied defendant's motion, summarizing, "[t]he Court declines at this point in time to further investigate those questions or to appoint counsel for [defendant] to further investigate the issues of ineffectiveness. The Court declines that because, again, they are squarely within the realm of trial strategy and based on the Court's participation in the trial and understanding of the evidence as it was presented at trial."[2] Defendant appeals.

¶ 26                                    II. ANALYSIS

¶ 27    Defendant's sole challenge on appeal concerns the trial court's ruling at the *Krankel* hearing that his ineffective-assistance allegations lacked merit. Specifically, he contends that the court improperly concluded that Jazwiec was not ineffective, whereas it should have considered only whether defendant had established possible neglect of the case and, thus, was entitled to assistance of counsel to help shape and argue his claims. Defendant asserts that the court instead evaluated whether the allegations conclusively satisfied the standard for demonstrating ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), and then rejected them, stating that they were "without merit and pertain[ed] only to trial strategy." He argues that the court's

---

[2] At the end of the hearing, the court noted that defendant had another trial pending, on a different matter, again with Jazwiec as his attorney. The court noted that defendant had just asserted that he believed Jazwiec to be ineffective, and the court questioned whether defendant wanted Jazwiec's representation to continue in the other case. Defendant twice reiterated that, yes, he still wanted Jazwiec to represent him in that matter.

finding that the claims were "without merit" was improper at the *Krankel* stage of proceedings and that, because a defendant may overcome the strong presumption of trial strategy, an ineffective-assistance claim should not be dismissed on that basis, particularly where the claim includes an allegation that counsel's failure to call the witness was due to a failure to investigate. For the following reasons, we disagree that the court committed error here.

¶ 28    New counsel is not automatically required when a defendant presents a *pro se* motion alleging ineffective assistance. Rather:

> "[W]hen a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim *lacks merit or pertains only to matters of trial strategy*, then the court *need not appoint new counsel and may deny the pro se motion*. However, if the allegations show possible neglect of the case, new counsel should be appointed." (Emphases added.) *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003).

If appointed, new counsel would help develop the defendant's claims and represent him or her at a hearing on those claims. In evaluating the defendant's claims, the trial court may ask the defendant questions, ask defense counsel for comments, and may base its evaluation on "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79. On appeal, our "operative concern" must be whether the trial court conducted an "adequate inquiry" into the defendant's allegations. *Id.* at 78. We review *de novo* the legal question whether the trial court properly conducted a preliminary *Krankel* inquiry. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 29    Here, the trial court's use of the words "without merit" do not automatically mean that the court conducted an improper hearing. As the State notes, our supreme court has stated, on multiple

occasions, that, following a preliminary *Krankel* hearing, a trial court may decline to appoint new counsel if the defendant's claim is meritless. See, *e.g.*, *People v. Jocko*, 239 Ill. 2d 87, 92 (2010) (quoting *Moore* for the proposition that no new counsel required where the defendant's claim "lacks merit"); *People v. Simms*, 168 Ill. 2d 176, 199 (1995) (no new counsel where the defendant's claim was "meritless," because counsel's "preparation of the post-trial motion and his decision whether to call various witnesses, including the defendant, were matters of trial strategy which may not be second-guessed"); *People v. Sims*, 167 Ill. 2d 483, 518 (1995) (if "there is no validity to the defendant's claim" or "it pertains to a matter of trial strategy," then new counsel need not be appointed); *People v. Byron*, 164 Ill. 2d 279, 305 (1995) (no new counsel required, because trial court properly concluded that the defendant's ineffective-assistance claims were "without merit").

¶ 30 Critically, these principles were recently again reaffirmed by our supreme court. Indeed, defendant relies heavily on the Fourth District's decision in *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 88, for its holding that a trial court committed reversible error where, in a *Krankel* hearing, it concluded that the defendant's allegations did "not amount to ineffective assistance" and that the defendant was "well represented," thereby, according to the appellate court, improperly ruling on the merits of the ineffective-assistance allegations, rather than determining only whether "possible neglect" rendered it appropriate to appoint new counsel.

¶ 31 However, shortly after briefing in this case concluded, our supreme court *reversed* the appellate court's decision. *People v. Roddis*, 2020 IL 124352, ¶ 70. The supreme court held that, in a *Krankel* hearing, courts may properly consider both the factual *and legal merits* of a defendant's ineffective-assistance claim. *Id.* In so doing, the court noted that its oft-quoted language from *Moore* that a trial court need not appoint counsel if the defendant's claim "lacks merit" (*Moore*, 207 Ill. 2d at 77-78) has never been interpreted by the supreme court as

distinguishing between factual and legal merit. *Id.* ¶ 55. The court reiterated that, at a *Krankel* hearing, a trial court may base its determination of the merits of a defendant's ineffective-assistance claims on its own knowledge of counsel's trial performance and emphasized, "[t]he trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect." *Id.* ¶ 56. The court concluded:

> "We find that, even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel. This serves both the ends of justice and judicial economy." (Emphases in original.) *Id.* at ¶ 61.

Thus, *Roddis* is fatal to defendant's argument, as framed on appeal, that the trial court improperly considered the legal merits of his ineffective-assistance claims during the *Krankel* hearing.

¶ 32 We note, however, that portions of defendant's briefs discuss the merits of his claims. To the extent that he also suggests that the court erred in determining that his claims did not show possible neglect, we would again disagree. As previously noted, is not improper for the court to reject claims that are clearly based on counsel's application of trial strategy (*Moore*, 207 Ill. 2d 68, 77-78), and both of defendant's claims here, concerning the scope of cross-examination and presentation of witnesses, fall squarely into that category. See, *e.g.*, *People v. Leeper*, 317 Ill. App. 3d 475, 483-83 (2000). Further, although a defendant may, theoretically, rebut presumptions of sound strategy in an ineffective-assistance claim, the claims here do not reflect neglect of the case or constitute bare assertions of strategy without any substance. See, *e.g.*, *People v. Maya*, 2019 IL App (3d) 180275, ¶ 27. As to Cooper, Jazwiec did not have him read the entirety of his email

aloud, but Jazwiec explained that he had concerns about Cooper's manner of answering questions, he chose which sections of the email to examine, and, most critically, Cooper's alleged statement that the State was threatening and bribing him *was addressed* multiple times at trial. As to Croom, defendant asserts that Croom would have testified that defendant was not the shooter, but points only to an affidavit for a search warrant that placed Croom on the scene at the time of the shooting. While defendant asserts that this shows "some support" for his claim, and he notes that counsel did not dispute his claim that Croom would have testified he was not the shooter, counsel's strategic decision that Croom might more strongly benefit the State was not unreasonable, given that the record shows that, even pretrial, the State anticipated that Croom could place defendant at the scene around the time of the crime but that he would *not* testify that he sold defendant marijuana. As such, Croom's testimony might have placed defendant at the scene but *damaged* defendant's alibi theory that, rather than shooting Sullivan, Croom could establish defendant merely purchased marijuana. In addition, the required prejudice is not established because, even if Croom had testified, Davis testified that she saw defendant commit the shooting. Jazwiec attacked her credibility, but the testimony of a single witness may be sufficient to sustain a conviction. See *e.g.*, *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In addition, while other witnesses could not identify the shooter, their general timelines of events surrounding the shooting were consistent, overall, with Davis's. We agree with the trial court that the record here does not suggest that counsel *neglected* to consider Cooper's email statements or whether Croom would be an advantageous witness; rather, it reflects that he chose his scope of cross-examination and to not call Croom as a witness as matters of sound trial strategy.

¶ 33    We also note that, although the phrase "had a reasonable level [of] pretrial investigation been done" appeared in defendant's written motion concerning his Croom-related ineffectiveness

claim, defendant never raised at the hearing any concern that Jazwiec failed to conduct a proper pretrial investigation into Croom. Indeed, the court asked him numerous times whether he wished to expand upon his claims, but defendant never asserted that counsel failed to properly investigate potential witnesses or, more specifically, Croom. Defendant's claims instead focused on his admitted discussions with counsel about Croom and whether calling him in defendant's case would be worthwhile.

¶ 34    In sum, the trial court here conducted a proper hearing and, further, noted that its ruling was based in part on its knowledge of the overall evidence, as well as counsel's performance at trial. The trial court did not err in determining that defendant's claims lacked merit and, thus, did not require appointment of new counsel.

¶ 35                                      III. CONCLUSION

¶ 36    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 37    Affirmed.